IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,            )
                                     )
          Plaintiff,                 )      CR No. 15-49
                                     )
                                     )      Washington, D.C.
          vs.                        )      April 14, 2016
                                     )      3:40 p.m.
CORNELL JONES,                       )
                                     )
          Defendant.                 )
_____)


TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:           Anthony D. Saler
                              Michael K. Atkinson
                              U.S. ATTORNEY'S OFFICE
                              Criminal Division
                              555 4th Street, NW
                              Washington, D.C. 20530
                              (202) 252-6971
                              anthony.saler@usdoj.gov
                              michael.atkinson@usdoj.gov

                              Kenneth C. Vert
                              U.S DEPARTMENT OF JUSTICE
                              Tax Division
                              P.O. Box 972
                              Washington, D.C. 20044
                              (202) 305-9792
                              kenneth.c.vert@usdoj.gov

APPEARANCES CONTINUED:

For the Defendant:              Bernard S. Grimm
                               THE LAW OFFCE OF BERNARD GRIMM
                               1627 I Street, NW
                               Suite 1100
                               Washington, D.C. 20006
                               (202) 912-4888
                               bgrimm@grimmlawdc.com


Court Reporter:                William P. Zaremba, RMR, CRR
                               Official Court Reporter
                               U.S. Courthouse
                               333 Constitution Avenue, NW
                               Room 6511
                               Washington, D.C. 20001
                               (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

```
1                  P R O C E E D I N G S
2            DEPUTY CLERK:  All rise.  This Honorable Court is
3    now in session.  The Honorable Judge Richard J. Leon
4    presiding.  God save the United States and this Honorable
5    Court.  Please be seated and come to order.
6            Your Honor, we have Criminal Action 15-49,
7    United States of America versus Cornell Jones.
8            Counsel, please approach the lectern and identify
9    yourselves for the record.
10           MR. SALER:  Good afternoon, Your Honor.
11   Anthony Saler for the United States.
12           And with me is Assistant U.S. Attorney
13   Michael Atkinson and Ken Vert, a trial attorney with the Tax
14   Division.
15           THE COURT:  Welcome back.
16           MR. GRIMM:  Good afternoon, Your Honor.
17   Bernard Grimm on behalf of Mr. Jones.
18           THE COURT:  Welcome back.
19           Mr. Saler, do you have a copy of the statement of
20   offense and relevant conduct there?
21           MR. SALER:  Yes, Your Honor.
22           THE COURT:  Come on up, bring it up to the podium.
23           Paragraph two it says, "Defendant was the managing
24   member of WFJ, LLC.  WFJ was incorporated in the
25   District of Columbia in March of '02.  WFJ owned real estate
```

1    located on Queens Chapel Road.  The defendant controlled,

2    managed, and directed WFJ and the disposition of its

3    assets."

4            He was the sole signatory on bank accounts held in

5    the name of WFJ, right?

6            MR. SALER:  Yes, Your Honor.

7            Yes, Your Honor.

8            THE COURT:  Now, later on in paragraph seven --

9    that was paragraph one -- two and three we were just looking

10   at -- it says on April 3rd of 2002, WFJ purchased

11   $1.4 million in real property that became known as 2371

12   Queens Chapel Road, Northeast; 2127 Queens Chapel Road,

13   Northeast; 2135 Queens Chapel Road, Northeast; and 2145

14   Queens Chapel Road, Northeast.  Is that four separate

15   buildings?

16           MR. SALER:  No, Your Honor.  The area was -- it

17   was one plot of land, and then it was subdivided into those

18   four different addresses.

19           THE COURT:  Was the building ever constructed on

20   the plot of land?

21           MR. SALER:  Eventually, yes, a building was

22   constructed.

23           THE COURT:  Well, so the 1.4 million was just for

24   the piece of property.  There wasn't any building on it.

25           MR. SALER:  That's correct, Your Honor.

1             THE COURT:  So it was a vacant lot?

2             MR. SALER:  That's my understanding, yes,

3    Your Honor.

4             THE COURT:  Did you ever see it?  Did you ever go

5    look at it?

6             MR. SALER:  Yes, Your Honor.  I mean, I've seen

7    the diagrams showing it, showing the subdivision.  And

8    I mean, I've, obviously, seen the condition it currently is.

9             THE COURT:  When were buildings built on it?

10            MR. SALER:  I don't know, Your Honor.

11            THE COURT:  Are there buildings on it now?

12            MR. SALER:  Yes, Your Honor.

13            THE COURT:  Were there buildings built on it while

14   this defendant was still running WFJ?

15            MR. SALER:  Yes, Your Honor.

16            THE COURT:  Do you know what year?

17            MR. SALER:  Well, Your Honor, so there -- one of

18   the properties, there was a company called Georgetown

19   Service Center, and that was one location.  And there was a

20   club called Echostage.  That was at another location.  One

21   of the parcels is a parking lot, and I believe another one

22   of the -- and these clubs have changed names different times

23   over the years.

24            THE COURT:  Okay.  Well, we'll come back to that.

25            The initial purchase was for 1.4 million.  Did you

1   inquire -- you've said that this defendant has been

2   cooperative with the government and assisted the government;

3   is that right?  That's what you've said, right?

4           MR. SALER:  The defendant assisted the government

5   in determining his -- the tax due and owing for the years

6   2008 through --

7           THE COURT:  That can be self-serving, unless it's

8   corroborable.

9           MR. SALER:  Yes, Your Honor.

10          THE COURT:  Did you inquire as to where he got the

11  1.4 million to purchase this property in 2002?

12          MR. SALER:  So we obtained the deed and the

13  mortgage records for it.  So it was financed.  It was a

14  seller-financed transaction for $1.2 million, and the rest

15  was a deposit that was placed on it.

16          THE COURT:  Seller.  Explain that, please.

17          MR. SALER:  The property was purchased from the

18  Wasserman Trust, which owned the land.  So they financed the

19  purchase of the property for $1.2 million.

20          THE COURT:  What is the Wasserman Trust?

21          MR. SALER:  It's the entity that controlled the

22  land.

23          THE COURT:  That's just an individual's trust or

24  is it a company trust?  I don't know what the Wasserman

25  Trust is.  I've never heard of it.

1          MR. SALER:  So, yeah, I don't remember the

2    specifics -- the first name of Wasserman, but it was

3    property that was owned by someone with the last name of

4    Wasserman, and then he passed away and then there was a

5    trust that owned the property.

6          THE COURT:  And did your investigation help you

7    understand why it was they were willing to lend the money to

8    a person who -- at that point whose only job had been $10 an

9    hour doing cleaning and a cleaning service?

10         MR. SALER:  No, Your Honor.  There was no one from

11   that time period who was available to discuss the

12   circumstances of the purchase of the land.

13         THE COURT:  So how much money did he actually put

14   down towards this seller-financed sale?

15         MR. SALER:  It would have been approximately

16   $200,000, Your Honor.

17         THE COURT:  200,000.

18         Now, based on his employment history up to that

19   point, he had only been out of prison at that point a matter

20   of a few years, right?

21         MR. SALER:  The defendant was released from prison

22   in 1996.

23         THE COURT:  Right.

24         And based on the employment history in the PSR, he

25   had almost no real assets or earning during those four years

1    prior to 2002, or five years prior to 2002.

2            Did you inquire from him or did he tell you where

3    he got the $200,000?

4            First, did you inquire?

5            MR. SALER:  Your Honor, that was not -- that was

6    not a topic that we discussed.

7            THE COURT:  You didn't discuss that.

8            Did he volunteer where he got the money?

9            MR. SALER:  Your Honor, he was not asked that

10   question.  He was asked questions --

11           THE COURT:  I didn't ask you if he was asked the

12   question.  You've already told me that; that you didn't ask

13   him.  I'm asking you something different.

14           You said he's cooperating; he was cooperating with

15   the government.  Did he come forward and tell the government

16   where he got the $200,000 at a point in time when he had no

17   assets and had no income from work between getting out of

18   prison and 2002?

19           MR. SALER:  No, Your Honor.

20           THE COURT:  He didn't.

21           Okay.  Now, let's look at paragraph eight.

22   Paragraph eight says that in December of 2009, WFJ entered

23   into a sales contract to sell real property located at 2127

24   Queens Chapel Road and 2371 Queens Chapel Road, right?

25           MR. SALER:  Yes, Your Honor.

1          THE COURT:  That's four of the address numbers

2    that you put forward in paragraph seven, right?

3          MR. SALER:  Two of the addresses, Your Honor.

4          THE COURT:  That's two of the four.

5          MR. SALER:  Yes.

6          THE COURT:  Right.

7          And that was a sale to something called Stadium

8    Group, right?

9          MR. SALER:  Yes.

10         THE COURT:  And Stadium Group was a company that

11   was owned by two individuals, Keith Forney, and

12   James Redding, right?

13         MR. SALER:  Yes, Your Honor.

14         THE COURT:  Right.

15         So in the seven years between the purchase -- oh,

16   by the way, let me back up.

17         The purchase was in 2002.  So between 2002 and

18   2009, he was making mortgage payments to the Wasserman

19   Trust, right?  It was self -- you said it was self-financed.

20         MR. SALER:  Yes, Your Honor.

21         THE COURT:  How many payments a year and what was

22   the amount per year during that time?

23         MR. SALER:  I don't have that information,

24   Your Honor.

25         THE COURT:  Did you get that information?

1          MR. SALER:  We did not ask Mr. Jones what the

2     source of his income was for his mortgage payments.

3          THE COURT:  Is there some reason why you didn't

4     ask?

5          MR. SALER:  Yeah.  This investigation was focused

6     on the income that he derived from 2008 to the present, and

7     evasive conduct that he did to avoid paying taxes on that

8     income.

9          THE COURT:  You weren't curious as to where he got

10    the money to pay the mortgage from '02 to '07 -- '09,

11    I mean?  You weren't even curious?

12         MR. SALER:  Your Honor, that was not part of our

13    investigation.  It was a tax investigation focused on the

14    years within the current -- the statute of limitations, and

15    that was -- and where we had the majority -- or where we had

16    really a complete set of records.

17         THE COURT:  You weren't interested if there was an

18    ongoing conspiracy going on?  I guess not.

19         Did he volunteer where he got it?

20         MR. SALER:  No, Your Honor.

21         THE COURT:  So he was making mortgage payments

22    between '02 and '09 to the Wasserman Trust when he wasn't

23    working other than for WFJ, right?

24         MR. SALER:  Well, Your Honor, I will say I know

25    that I believe at one point the property was placed in

1    foreclosure.

2              THE COURT:  Excuse me?

3              MR. SALER:  I believe at one point the property

4    may have been placed in foreclosure.  So in terms of

5    mortgage payments, I can't say that he was consistently

6    making mortgage payments.

7              THE COURT:  Are you familiar with the documents

8    received from the defendant by Probation in response to the

9    request from Probation for employment history?  Did you see

10   it?  Did you ask to see it?

11             MR. SALER:  Are you talking about -- if you could

12   be more specific, Your Honor.

13             THE COURT:  Well, the Probation Officer, as is her

14   practice in the normal course of doing a PSR, sends

15   questions to the defendant asking for his self-employment

16   history.

17             MR. SALER:  Yes, Your Honor, I'm familiar.

18             THE COURT:  Right.  You know that, right?

19             MR. SALER:  Right.

20             THE COURT:  And she did that in this case as well.

21   She sent a series of questions, to which he responded one

22   page, one page that had four lines.

23             First line is that between 1996 and 2000 -- this

24   is his self-employment history now -- that he made $10 an

25   hour for J & J Janitorial Services, is what he said.

1        That from 2000 to 2010 -- this would have been the

2   period when he was paying, supposedly, mortgage payments to

3   Wasserman Trust, right -- he has here Miracle Hands.  That's

4   the organization that he was sued for, was it not, for

5   fraud?

6        MR. SALER:  Both him and Miracle Hands, yes,

7   Your Honor, right, for civil False Claims Act.

8        THE COURT:  False Claims Act.

9        This was the organization that he had received a

10  federal tax exemption for; is that right?

11       MR. SALER:  It was a tax-exempt organization.

12       THE COURT:  Tax-exempt organization, which

13  requires the filing of tax returns, did it not?

14       MR. SALER:  Yes, Your Honor.  That's in the

15  statement of offense.

16       THE COURT:  Which he never filed, correct?

17       MR. SALER:  He didn't file -- or Miracle Hands did

18  not file for a three-year period.

19       THE COURT:  And according to your memorandum in

20  aid of sentencing, the District of Columbia, there was a

21  trial in the Superior Court in a judgment of $329,000.

22  $329,653 in damages was awarded against him and Miracle

23  Hands.

24       MR. SALER:  Yes, Your Honor.

25       THE COURT:  This was an organization that was

1   supposedly granted tax-exempt status, because it was

2   being -- providing services to benefit low-income persons

3   diagnosed with HIV and AIDS, right?

4           MR. SALER:  Yes, Your Honor.  It's in the

5   memorandum, yes.

6           THE COURT:  And so this was an organization that

7   was found in a trial in Superior Court in what year?

8   Let's see here.  The trial was in --

9           MR. SALER:  I believe it was.

10          THE COURT:  -- 2011, right?  Yeah.

11          Well, the Complaint was in 2011.

12          MR. SALER:  I believe the order, the final order

13  by the judge was 2014.

14          THE COURT:  Yeah.  Okay.

15          Now, it says here in his response to the Probation

16  Department's -- excuse me, the Probation's inquiry, that he

17  made $55,000 a year at Miracle Hands between 2000 and 2010.

18          And then it says between '99 and 2009, he made

19  $24,000 a year from the D.C. Tunnel Events Center.  Did you

20  inquire about what that was?

21          MR. SALER:  Yeah.  D.C. Tunnel was a club that was

22  at one of the Queens Chapel Road properties.

23          THE COURT:  It was a club?

24          MR. SALER:  Yes.

25          THE COURT:  Uh-huh.

1          And did you talk to the people who paid him
2    supposedly $24,000 a year?
3          MR. SALER:  No, Your Honor.
4          THE COURT:  No.
5          So there's no verification, either in document
6    form or in the form of interview statement to an IRS agent
7    or whatever, that, indeed, was what he was being paid per
8    year, $2,000 a month, $24,000 a year from D.C. Tunnel Events
9    Center in that period, right?
10          MR. SALER:  Yes, Your Honor.
11          THE COURT:  And with regard to Miracle Hands,
12    did you verify that he was getting $55,000 a year between
13    2000 and 2010?
14          MR. SALER:  In terms of calculating his income, we
15    cal- -- for the tax loss, we included all the income that he
16    did receive from Miracle Hands.
17          THE COURT:  That he said he received.
18          MR. SALER:  No.  We included all the income that
19    we had documentary evidence showing that he received.
20          THE COURT:  What form did that documentary
21    evidence take?
22          MR. SALER:  Bank account records, Your Honor.
23          THE COURT:  Bank account records.
24          And were there checks that were payable to him?
25          MR. SALER:  I believe so, Your Honor.

1          THE COURT:  Now, according to his employment

2    statement here, which, like I say, only consists of four

3    lines, he didn't answer the questions.  Other than these

4    four lines, he didn't start getting any income from WFJ

5    until 2010.  It says from 2010 to 2015, he got 40,000 a

6    year.  Is that not inconsistent with your statement of

7    offense?

8          Didn't you say he was getting annual income from

9    WFJ right from the beginning in 2002 when they acquired the

10   properties?

11         MR. SALER:  No, Your Honor.  The statement of

12   offense relates to income that WFJ received from the sale of

13   real estate from the rent -- from renting a portion of the

14   real estate and from interest income.

15         THE COURT:  All right.  Well, let's go back to

16   your statement then.

17         Paragraph eight, they sold the two pieces of

18   the -- the two subdivisions, 2127 and 2371 Queens Chapel

19   Road, Northeast, to the Stadium Group owned by Keith Forney

20   and James Redding, right?

21         MR. SALER:  Yes, Your Honor.

22         THE COURT:  Paragraph eight.

23         For 2.8 million, right?

24         Can't hear you.

25         MR. SALER:  Yes, Your Honor.

1            THE COURT:  Now, they here purchased this property

2    at 1.4 million, just seven years earlier.

3            MR. SALER:  Yes, Your Honor.

4            THE COURT:  That's quite a profit.

5            And then it says in paragraph 10, as payment for

6    the earned fee of 2.8 -- 2,880,000, Stadium Group agreed to

7    make 120 consecutive monthly payments of $24,000 to the

8    defendant.

9            MR. SALER:  Yes, Your Honor.

10           THE COURT:  And then the next paragraph says,

11   between January 2010 and May of 2013 -- that's almost three

12   years -- Stadium Group paid approximately $850,000 to WFJ

13   as, quote, "consulting payments," into ATR, Inc., which was

14   controlled by James Redding, paid an additional $20,000.

15           So if you divide three years by months, 36 months

16   times 24,000, that comes out to about $864,000.  That about

17   lines up.  Were you able to receive documentary evidence

18   corroborating that?

19           MR. SALER:  Well, it's in the statement of

20   offense, yes, Your Honor.

21           THE COURT:  That those payments were actually paid

22   out?

23           MR. SALER:  Yes, Your Honor, that's what it's

24   based on.

25           THE COURT:  I'm just checking, because there's a

1   lot of things, obviously, that you weren't able to

2   corroborate.

3           Then it says in the next paragraph, March of '10,

4   WFJ sold the same two properties that they, in paragraph

5   nine -- paragraph eight, 2127 Queens Chapel Road and

6   2371 Queens Chapel Road sold the same two pieces of property

7   that they had sold to Stadium Group for 2.7 million to

8   RF Holdings, controlled by Keith Forney and James Redding.

9           MR. SALER:  Your Honor, there was only one --

10  there's only one sale of the property, and that's the

11  2.79 million in paragraph No. 12.

12          THE COURT:  Well, in paragraph nine, it says the

13  sale was to Stadium Group; and paragraph eight, it says it

14  was to Stadium Group in December of 2009.  And then in March

15  of 2010, it says it's to RF Holdings.  What happened?

16          MR. SALER:  So in December 2009, there's a sales

17  contract to sell it to Stadium Group.  It was just a

18  contract.  There was not an actual sale.

19          At that same time, they signed this consulting

20  agreement, and that called for the $24,000 monthly payments.

21          And then it was not until March 8th, 2010, where

22  there was an actual sale of the property, and that was to

23  RF Holdings.

24          Mr. --

25          THE COURT:  Mr. Saler, explain to me your basis to

1   believe that this defendant will be able to have, as a

2   condition of supervision, which is what you ask for, the

3   repayment of the $1.7 million in taxes that he owes the

4   United States.

5            Explain to me how you think, when he gets out of

6   jail someday, he'll be able to repay that.

7            MR. SALER:  Your Honor --

8            THE COURT:  What's your basis to believe that?

9            MR. SALER:  -- in our sentencing memorandum, we

10  ask for the Court to impose that as restitution.  I did not

11  suggest that he has $1.7 million to pay.

12           THE COURT:  Do you have any basis to believe that

13  he can ever pay the 1.7 million?

14           MR. SALER:  If you're asking me today based on

15  what I --

16           THE COURT:  Yeah.  Based on what you know today,

17  what realistic chance is there that he will ever be able to

18  pay $1.7 million in restitution?  What is your basis?

19           MR. SALER:  Your Honor, I've never asserted that

20  I believe that he's going to be able to repay $1.79 million.

21  I've asked the Court to impose that as restitution.

22           The government has asked for a period of

23  incarceration.  I don't know what the defendant's financial

24  circumstances will be once he's released from incarceration.

25           THE COURT:  Well, you know what he told Probation,

1    right?  Because did you see his net worth statement?

2    Did you look at it?

3            MR. SALER:  I read the report which summarized it,

4    yes, Your Honor.

5            THE COURT:  According to his net-worth statement,

6    he has no assets, none, at least none that he's admitting

7    to.

8            In your statement of the offense, you say that he

9    used some of the monies he got from WFJ Holding to give to

10   his live-in girlfriend, I guess you'd have to say, who lives

11   in Chevy Chase, Maryland, to help her pay her mortgage;

12   isn't that right?

13           MR. SALER:  Yes, Your Honor.

14           THE COURT:  Right.

15           And what interest, if any, does he have in that

16   house?

17           MR. SALER:  Well, that's part of the evasion,

18   Your Honor.  He is not -- he was not listed on the mortgage,

19   and he's not listed as the titled owner to the residence.

20           THE COURT:  All right.  So did you actually see

21   the deed?

22           MR. SALER:  Yes.  I know for a fact he's not the

23   titled owner.  I know for a fact that he's not listed on the

24   mortgage.

25           THE COURT:  Well, Probation doesn't know that.

1   So they're going to run that down.  They're going to run

2   some of these facts down that have, at this point, not been

3   clearly set forth for the benefit of the Court, because, as

4   I'm sure you appreciate, there is a co-relationship between

5   all of this and acceptance of responsibility.  Whether he

6   has been honest and straightforward with the government and

7   the Court relates directly to whether or not this Court can

8   find that he has accepted responsibility here.  And, of

9   course, if he hasn't accepted responsibility, that affects

10  the Guidelines calculation, as I'm sure you're well aware.

11          MR. SALER:  Yes, Your Honor.  And I don't think

12  that the defendant's disputing that he's not listed on the

13  mortgage and that he's not the titled owner of the

14  residence.

15          THE COURT:  Uh-huh.

16          How about the multiple other buildings that he

17  owned back in '85, did you see who owned those?

18          MR. SALER:  I'm not sure what you mean.

19          Oh, you mean 1985, you mean?

20          THE COURT:  Well, there were, like, five buildings

21  that he was a real estate holder in.

22          MR. SALER:  No, Your Honor.  The government did

23  not investigate his real estate holdings from 1985.

24          THE COURT:  So is it possible he still has a

25  property interest in those five homes?

1          MR. SALER:  I don't know, Your Honor.

2          THE COURT:  You don't know.  So it's possible

3    then.

4          You have checked it.

5          MR. SALER:  No, we have not gone back to check the

6    records from --

7          THE COURT:  I think you should be checking that.

8    I think you should be looking into it to verify the accuracy

9    of that.

10         What's the status of the $329,000 in damages?  The

11   judgment in that case?  To your knowledge, has any of it

12   been paid?  If you know.

13         MR. SALER:  I don't.  I know that -- I've reviewed

14   the Court docket.  I know they have attempted to attach

15   assets.  I don't know if they have been successful or not.

16         THE COURT:  I see.  Well, according to these

17   documents, he has no assets, right?

18         MR. SALER:  I don't know if they have been able to

19   obtain any assets, Your Honor.

20         THE COURT:  In your brief, your memo in aid of

21   sentencing you say, "He met with the government on three

22   separate occasions and provided documents requested by the

23   government."

24         Tell me about those documents.  What kind of

25   documents were they?

1          MR. SALER:  These were documents related to

2   expenses for the real property, such as payment of real

3   estate taxes, legal fees, documents that would help us

4   calculate what his basis was or what WFJ's basis was on the

5   property.

6          THE COURT:  Explain that a little more fully.

7          This is the four properties that were subdivided

8   on Kings Hill Road [sic]?

9          MR. SALER:  On Queens Chapel Road.

10         THE COURT:  Queens Chapel Road?

11         MR. SALER:  Yes, Your Honor.

12         So receipts showing payment of real estate taxes,

13  receipts showing payments of legal fees related to property,

14  documents that would be deducted from his -- from his income

15  or from his calculated income.

16         THE COURT:  Did he provide you any of the

17  documents that you found or needed to show the four-point --

18  what was it, 4.5 million he took out of the business over

19  six years?

20         MR. SALER:  Well, his total -- yes, that's

21  approximately correct, Your Honor.

22         THE COURT:  It was approximately four and a half

23  million, approximately, out in a six-year period, wasn't it?

24         MR. SALER:  Yes, Your Honor.

25         THE COURT:  All right.  That's what he owes the

1   1.7 million on, right?

2          MR. SALER:  That's correct, Your Honor.

3          THE COURT:  Did he provide you any of the

4   documents you needed to demonstrate the cash he was taking

5   out of these businesses that amounted to the four-point --

6   roughly, 4.5 million?

7          MR. SALER:  Your Honor, we have all of the bank

8   records which documented the cash withdrawals, both ATM and

9   counter withdrawals.

10          THE COURT:  So he wasn't really providing any

11   assistance in that regard to the government?  You didn't

12   need him for that, right?

13          MR. SALER:  That's correct, Your Honor.

14          THE COURT:  So the documents he was providing to

15   you that were of assistance to the government related to

16   what?

17          MR. SALER:  So the IRS could accurately calculate

18   what the tax loss was to the government.

19          THE COURT:  So what kinds of document were those?

20          MR. SALER:  Again, Your Honor, it would be for his

21   payments of real estate taxes, payment of legal fees related

22   to the WFJ.

23          THE COURT:  What kind of legal fees?

24          I mean to the actual purchase itself, the putting

25   together the deed, that kind of thing or --

1          MR. SALER:  That was part of it, Your Honor, yes.

2          THE COURT:  So what are we talking about here?

3  What kind of amount of money was involved in that regard?

4  Was it even $10,000?

5          MR. SALER:  Your Honor, if I could have the

6  Court's indulgence, please.

7          THE COURT:  Yeah, go ahead, talk to your agent.

8          MR. SALER:  It's not to talk to the agent,

9  Your Honor.

10          (Pause)

11          MR. SALER:  He provided documents related to legal

12  fees in 2009 and 2010, as also related to real estate taxes,

13  and also to mortgage interest payments that he had

14  provided -- that he had paid to the Wasserman Trust.

15          THE COURT:  What do they total?

16          MR. SALER:  In 2009, the legal fees were $35,000.

17  In 2010, the legal fees were 148,000.

18          THE COURT:  $148,000 in 2010?  What was it for?

19          MR. SALER:  I don't specifically remember at this

20  time, Your Honor.

21          THE COURT:  That's a -- those are substantial

22  legal fees, $148,000.  You can know what it was for?

23          MR. SALER:  I don't remember offhanded right now.

24          THE COURT:  Maybe a colleague knows sitting over

25  there.  Why don't you go ask your colleague from the Tax

1  Division.

2          MR. SALER:  He was not present during these

3  interviews, Your Honor.

4          THE COURT:  Well, who was?

5          Was Mr. Atkinson present?

6          MR. SALER:  He was not, Your Honor.

7          THE COURT:  Was there an agent present?

8          MR. SALER:  Yes, Your Honor.

9          THE COURT:  Is the agent here in the room?

10         MR. SALER:  Not -- no, not the agent,

11  I don't believe the agent who was present at that interview.

12         THE COURT:  I want a breakdown of all of those

13  expenses.

14         MR. SALER:  I have it for you.  I can --

15         THE COURT:  Yeah.  I want you to get it for me.

16         There's no rush, don't worry.

17         MR. SALER:  I mean, I --

18         THE COURT:  Now, there is no rush.  Take your

19  time.

20         I want it clear.  I want to know what it's about,

21  all right?

22         What other ways did he help the government?

23         MR. SALER:  Your Honor, as I stated, he -- when he

24  first became aware of the investigation, he immediately

25  obtained counsel.  He came in on the first day that we had

1   asked him, and he clearly indicated that he wanted to

2   resolve this and he wanted to accept responsibility for it.

3        We had two other meetings after that, and we

4   requested documents from him, and he provided those

5   documents.

6        THE COURT:  What other kinds of information did he

7   provide you that you really needed?

8        MR. SALER:  Your Honor, it's the information I

9   discussed, the information related to expenses of WFJ so

10  that we could accurately calculate his tax loss.

11       THE COURT:  So at the point you contacted him the

12  first time, your investigation had already been going on

13  for, what, a year, two years?

14       MR. SALER:  It had been going on for a period of

15  time, Your Honor, yes.

16       THE COURT:  Well, let's be a little bit more

17  specific.  At least a year?

18       MR. SALER:  Yes, Your Honor.

19       THE COURT:  Two years?

20       MR. SALER:  Between a year and two years,

21  Your Honor, yes.

22       (Pause)

23       THE COURT:  Did you go back and look at the

24  properties, the deeds and the title on the properties

25  that -- to see if he had any interest in them that he

1  purchased for his mother, sister, and cousin?

2          MR. SALER:  Are you talking about from 1985,

3  Your Honor?

4          THE COURT:  It says here in the presentence

5  investigation report that -- from an earlier PSR, that he

6  had interests in real property in at least five residences:

7  6 Hanover Place, Southeast; 8 Hanover Place, Southeast;

8  326 Brockton Road, Oxon Hill, Maryland; 6204 Geneviere

9  Court.

10          The latter residence was apparently titled to his

11  mother, sister and cousin.

12          And the Oxon Hill was titled to him in '82.

13          Did you check to see what the status of those

14  titles was to see if he had any interest in any of those

15  properties?

16          MR. SALER:  We did not check to see if he was the

17  titled owner of -- currently the titled owner of any of

18  those properties.

19          THE COURT:  I'll have Probation do that.

20          I'm sure I'll have more questions later.

21          Thank you, Mr. Saler.

22          Mr. Grimm.

23          MR. GRIMM:  Yes, Your Honor.

24          Good afternoon, Your Honor.

25          And I'll try to answer some of the Court's

1    questions.  I apologize.  I'm sick.

2            In February and March of last year, Mr. Jones had

3    prior counts on Mr. McDaniels, who first met with Mr. Saler.

4            Mr. Jones brought in legal fees from -- and if I

5    could back up, Wasserman Trust is -- he purchased the

6    property from Wasserman Trust.  Wasserman Trust was also the

7    lender.

8            The collateral for the loan -- because the Court

9    asked a good question -- was provided by Mr. Jones's father,

10   William Jones, and that was -- if the Court could give me

11   one second -- 5601 Martin Luther King Highway in Seat

12   Pleasant, Maryland.  It was nine acres.  And amongst other

13   things on the acreage was a gas station.  That property,

14   which was owned by Mr. Jones's father free and clear, was

15   used to collateralize the loan.

16           Mr. Jones then retained me as counsel.

17           THE COURT:  What month did you come into the case?

18           MR. GRIMM:  Exactly almost a year ago, Your Honor:

19   March of 2015.

20           THE COURT:  March of 2015.

21           MR. GRIMM:  Mr. Jones and his father came into my

22   office, I was Mr. Jones's -- Cornell Jones's lawyer.

23   Mr. William Jones retained me, his father, who had retired.

24           In terms of $1.7 million -- and the Court is

25   saying, where the heck is somebody going to get the money

1    like that based on what I have before me.

2            THE COURT:  Well, frankly, Mr. Grimm, to be

3    brutally honest, until I got these papers, by which I mean

4    the PSR --

5            MR. GRIMM:  Yes.

6            THE COURT:  -- and the pleadings, I was proceeding

7    on an assumption.  Boy, was I wrong.  Boy, was I wrong.

8            I was proceeding on the assumption that this man

9    had -- as is represented by the government, had taken four

10   and a half million, roughly, out of these businesses over a

11   six-year period, he owed the government 1.7 million, and

12   that he had the 1.7 million to pay.

13           It never occurred to me that he would fill out a

14   net-worth statement of the kind he filled out that

15   demonstrates, unequivocally, no potential capacity to repay

16   restitution, zero.

17           He has no assets; he has no income; he has no

18   skills that can, apparently, generate that kind of income.

19   There is no reason to believe, based on what he has filled

20   out here -- now, there's some of it that's inconsistent that

21   needs to be fixed, fleshed out:  The self-employment

22   checklist, at a minimum, has to be answered, it was not

23   answered.  His response, it was only four lines, which is

24   inherently inconsistent, makes no sense, has to be

25   accurately restated and clarified, and I might add, sworn to

1   under the penalties of perjury.  So we're going to get all

2   that done.

3            There will not be any sentencing until the record

4   is accurate and clear with regard to his assets, with regard

5   to any potential he has to pay restitution, because all of

6   that relates to two things:  Acceptance of responsibility

7   and what is an appropriate sentence in a case like this from

8   the point of view of deterrence and from the point of view

9   of just punishment for his conduct.

10           MR. GRIMM:  Yes.

11           THE COURT:  They're all interrelated.  They're all

12  interrelated.

13           MR. GRIMM:  It all comes into what the Court

14  thinks is what's fair based on all the facts, what's

15  represented, what's true, what's not true.

16           Ms. Renee Moses-Gregory sent me the financial

17  forms.  And I'll fall on my sword.  I did not get those

18  forms to Mr. Jones in time.

19           But what I can tell the Court is the Court saying,

20  well, Mr. Grimm, I'm coming into the game here based on the

21  assumption that Mr. Jones has this money to pay the

22  government back.

23           THE COURT:  Well, I, frankly, thought the only way

24  to understand how the government would be willing to have

25  made the deal the government made was that this man had the

1   money set aside.

2           I mean, he took such a large amount of money out

3   of these companies, and it's -- apparently, there's none

4   left.

5           MR. GRIMM:  Right.

6           THE COURT:  Or at least that's what he's saying.

7           There are no assets anywhere he has any interest

8   in; that he's blown through $4.6 million tax-free, I might

9   add, 4.6 million tax-free in a six-year period.

10           MR. GRIMM:  Yes, Your Honor.

11           Your Honor, what I can tell the Court --

12           THE COURT:  Is that his position, Mr. Jones's

13   position?

14           MR. GRIMM:  The Court's -- I can answer the

15   Court's assumption is not incorrect.

16           Mr. Jones pled guilty.  It was sort of an unusual

17   plea for me, Your Honor, in that there's sort of no

18   written --

19           THE COURT:  No plea agreement.

20           MR. GRIMM:  No plea agreement.  And he pled guilty

21   to everything.

22           And then the Court went through the information

23   with him, sort of in a very detailed fashion.

24           But it was an unusual plea for me, because usually

25   there's an exchange where you plead guilty, something is

1    dropped or you can get some concession down the road.  So I

2    go in with Mr. Jones.

3              And I can tell the Court the house he owns with

4    his wife, with his partner, at 3225 Park View Road in Chevy

5    Chase for 19 years, Your Honor --

6              THE COURT:  Chevy Chase, Maryland?

7              MR. GRIMM:  I'm sorry.  I should be --

8              THE COURT:  That's all right.

9              MR. GRIMM:  20815.

10             And Chevy Chase, as the Court knows, is on both

11   sides of the lines there.

12             THE COURT:  It is.

13             MR. GRIMM:  That property is going to be

14   collateralized to pay towards the 1.7, because the Court --

15   it's a fair question.  Mr. Grimm -- I'm coming in here based

16   on this assumption not only is Mr. Jones broke, he's beyond

17   broke.

18             But I can tell the Court that based on the

19   meetings that I had with Mr. Saler and based on Mr. Jones's

20   meeting with Mr. Saler, because it wasn't me going in there

21   representing things to Mr. Saler, Mr. Jones came in with

22   legal bills from Wasserman Trust, because when he went

23   through Wasserman Trust, he had to use their attorneys --

24             His attorney, Mr. Richard Sugarman, an

25   accountant -- I'm sorry, Mr. Sugarman, an attorney.

1    Anthony Tangi, who's an accountant, we provided all those

2    legal bills to Mr. Saler.  That was part of the reason, one,

3    why Mr. Jones was able to get the plea he got.  And for my

4    money, I thought the plea should have been better.

5            But, two, the government wanted to know, listen,

6    we're not going to enter into a deal unless we have some

7    expectation that this money is going to be coming back, at

8    least some of it, because that's not fair to have somebody

9    essentially steal from the government, rip the government

10   off, and then not have the ability to pay him back.

11           So Mr. Jones, Your Honor -- and these legal bills

12   are properties that he's run and managed and sold over a

13   ten-year property --

14           THE COURT:  These are the four Queens Chapel Road

15   properties, right?

16           MR. GRIMM:  Yes, sir.  Yes, sir.

17           And over ten years, I think the Court said

18   $148,000 in legal bills.  That bill was provided to

19   Mr. Saler.  And I can provide a copy to the Court, because

20   when you're talking about this much money, the Court's

21   right, there should be records, there should be accounting,

22   there should be -- Mr. Jones, if you have the money to pay

23   this, we need to see the proof that you're able to pay it,

24   because, I think, to me, that would factor into the Court's

25   sentence.

1           And I'm sorry, Your Honor, I just lost my train of

2    thought.

3           THE COURT:  That's all right.

4           MR. GRIMM:  So from 2000 -- 1996 to 2000,

5    Your Honor --

6           THE COURT:  Where did the money go, Mr. Grimm, to

7    your knowledge?

8           MR. GRIMM:  Money?

9           THE COURT:  Where did the 4.6 million go?

10   If there are no assets, either real or structural, there's

11   no property assets, where, you know, that's, if you

12   divide -- if you divide it by six, it's like 775- or

13   $790,000 a year tax-free.  Where did the money go?

14          MR. GRIMM:  Yes, Your Honor.  I have, from the

15   Office of D.C. Tax Revenue, documents from -- for lot 34,

16   144, 143, 144, 145.

17          THE COURT:  So he paid real estate taxes.

18          MR. GRIMM:  Real estate taxes, investments on

19   these properties that he completely blew, just wasted.

20          THE COURT:  What do you mean by "investments"?

21          Are they buildings they tried to put up or

22   something?

23          MR. GRIMM:  Well, Queens -- yeah.  Well, Queens

24   Chapel started off as just a vacant lot --

25          THE COURT:  Right.

1        MR. GRIMM:  -- in an area that was just sort of

2   besieged with drug dealing and dilapidation, and just run

3   into the ground, under water.

4        THE COURT:  Right.

5        MR. GRIMM:  Mr. Jones, instead of trying to

6   rebuild it, tried to do buildouts of this property on the

7   existing property.

8        You're talking about someone who had no real

9   estate experience, didn't know anything about zoning, didn't

10   know anything about variances, hired lawyers, developed

11   legal fees that were over his head, construction companies

12   that just flatout stole from him, tried to get -- do some of

13   the building and the work himself.  Hired people off the

14   street.  One mistake after another, where he just continued

15   to pour money into one property that was subdivided

16   eventually into four properties, Your Honor.  And that is a

17   lot of money, and the Court is 100 percent right.

18        THE COURT:  When was the D.C. Tunnel Events Center

19   built?  That's the nightclub, right?

20        MR. GRIMM:  D.C. Tunnel is a nightclub,

21   Your Honor.

22        Could I --

23        THE COURT:  Yea, go ahead.  You can check.  Check

24   with him.

25        MR. GRIMM:  Without any certainty, 1998, '99.

1          But we can't fix that, but I can get the Court

2   documents if the Court wants.

3          THE COURT:  Was that structured for the club on

4   that Queens Chapel lot, vacant lot?

5          MR. GRIMM:  Yes, Your Honor.

6          THE COURT:  So it was one of the four addresses?

7          MR. GRIMM:  One of the four addresses.

8          One of four addresses that -- when he started --

9   that club lost money, and Mr. Jones stayed in when he should

10  have gotten out, so...

11         THE COURT:  So the money to actually build the

12  structure, who financed that?

13         The property was financed through a Wasserman.

14         MR. GRIMM:  Yes.

15         THE COURT:  I understand that.

16         MR. GRIMM:  Yes.

17         THE COURT:  Although I don't know the details,

18  obviously.

19         What was his annual mortgage payment to Wasserman?

20  I mean, I don't know what that was.  Mr. Saler didn't know

21  ether.

22         But then they had to finance building a structure

23  for the club --

24         MR. GRIMM:  Yes.

25         THE COURT:  -- the D.C. Tunnel Events club.

1           How is that?  Where did the money come from to

2     purchase the club?  I mean to purchase the structure too,

3     build the structure.

4           MR. GRIMM:  I should have -- Your Honor, in my

5     memorandum to the Court, I should have answered that for the

6     Court and I didn't.

7           It's obvious that there's questions that the Court

8     has.  Instead of me giving it to the Court in teaspoons and

9     back and forth with Mr. Jones, which is unfair to the Court,

10    what I would like to do is essentially do an accounting of

11    Queens Chapel Road from the ground up and supply the Court

12    with a different memorandum but with documents attached so

13    the Court has proof of what is being represented to the

14    Court, not that the Court was doubting me.  But when it

15    comes to money, that much money, I'd like to see a

16    document -- especially if I'm purchasing a house or buying

17    something, I want to see a document.

18          THE COURT:  I'll tell you, Mr. Grimm, you have a

19    long history in this courtroom.  I'm not doubting you.

20          MR. GRIMM:  Oh, very well.  Thank you.

21          THE COURT:  But we're going to, obviously, get to

22    the bottom of some of these things.  I'll give you a couple

23    weeks to sort of flush it out.  Give Mr. Saler some time to

24    figure out some of the answers to these questions.

25          Probation is going to be revisiting these issues

1    with Mr. Jones.  He's going to have to fill out some forms

2    that he didn't previously fill out.  He's going to have to

3    fill them out under the penalties of perjury.

4         And I'll have a much more complete and accurate

5    record at that time to consider in assessing things such as

6    acceptance of responsibility, restitution, and the realistic

7    prospects that he can provide any restitution down the road

8    whatsoever, because, obviously, if the Court were to

9    conclude there was no realistic chance of it, that would

10   impact the Court's sentence, and it should impact the

11   Court's sentence, because the government is asking for that

12   as a condition of supervision, and, you know --

13        MR. GRIMM:  It was in the memorandum.

14        THE COURT:  Yeah.  And that's -- you know, that's

15   the way it is.

16        MR. GRIMM:  Your Honor, that's my fault.  I should

17   have answers to all these questions for the Court.

18        THE COURT:  Well, I don't think you should.

19        MR. GRIMM:  I don't --

20        THE COURT:  I don't view it as fault, Mr. Grimm,

21   on your part or anyone else's part.  I just think we have a

22   record here, unfortunately, that is chock-full of holes and

23   unclarity about what's going on here or what went on here,

24   and the amount of money here that this man, by his own

25   admission, took out of these businesses in a six-year period

1  is a staggering amount of money.  $4.6 million is a

2  staggering amount of money.  He owes the IRS, according to

3  his calculation, 1.7 million, and yet, notwithstanding all

4  of that, he submits to Probation a net-worth statement where

5  he has zero assets, zero cash in any bank anywhere.

6          This is a defendant who has, in his background, a

7  history of stashing money and hiding money.  That's part of

8  the PSR.  It's right there.

9          During the time in his life when he was involved

10 in narcotics transactions, he had a history of putting money

11 into residences, hiding money in large sums of cash.  This

12 is in his past; this is in his background.

13         One would think -- certainly, I would think, that

14 because of that history, the government, in this case, would

15 have run certain leads to the ground to satisfy itself that

16 that wasn't happening here, because, after all, the

17 government is protecting the public's interest, and this is

18 a guy who also was sued for fraud during the very time this

19 investigation was going on and had a judgment returned

20 against him for $329,000.

21         So, look, the record is woefully incomplete;

22 it needs to be clarified.  You can have three weeks to

23 submit whatever you need to submit.  Is that enough time?

24         MR. GRIMM:  Can I have a moment, Your Honor?

25 I need -- Your Honor, the Court's asking, this is a hell --

1    for lack of a better term, it's a hell of a lot of money

2    that should be accounted for, and the Court's questions are

3    right, and I should have answered these questions and

4    I didn't.  Your Honor, can I get my calendar?

5              THE COURT:  I'm not blaming you, Mr. Grimm, at

6    all.

7              MR. GRIMM:  Can I get my calendar, Your Honor?

8              THE COURT:  Oh, of course.  Go right ahead.

9    It's more important it's done right.

10             How about a month?  Do you think that'll be enough

11   time?

12             MR. GRIMM:  Yes, sir.

13             THE COURT:  Because Probation has got to meet and

14   give him some forms to fill out.  And we need to get, you

15   know -- and then, of course, hopefully, when I review

16   whatever it is you all come up with, I won't have -- I hope

17   I won't have more questions.

18             Mr. Saler has the benefit of an IRS agent who can

19   help him put together the answers to some of these questions

20   and check some deeds and make sure that there aren't still

21   outstanding interests anywhere in real estate, et cetera,

22   et cetera.

23             (Pause)

24             MR. GRIMM:  The week of May 16th, Your Honor, if

25   that's available --

1          THE COURT:  Sure.  If you could just --

2          MR. GRIMM:  -- to the Court.

3          THE COURT:  I'll give you a month -- a month to

4     submit whatever you want to submit.

5          MR. GRIMM:  Very well.

6          THE COURT:  And then I'll at least need a week to

7     review it.  Depending on what's in it, I might need a little

8     bit more than a week to review it.  But certainly by the end

9     of May, I should have reviewed it.

10         MR. GRIMM:  And, Your Honor, I may need to just

11    get an accountant, try to streamline it, but there's a

12    reason I'm an attorney, not an accountant, Your Honor.

13         THE COURT:  And, you know, because Probation works

14    for the Court, you might run by -- whatever you find by my

15    Probation Officer, because if she has difficulty,

16    hypothetically, understanding whatever you put together,

17    then I might very well have the same difficulty.

18         So it might be prudent to just run by -- whatever

19    you come up and whatever Mr. Saler comes up with, run it by

20    my Probation Officer so that there's clarity not only in her

21    quarter but my quarter as to the situation that led us to

22    where we are today with this particular defendant.

23         MR. GRIMM:  Yes, Your Honor.  All I need is

24    clarity for some document that I'm going to file with my

25    signature on it.  Tomorrow's tax day.  You reminded me.

1          THE COURT:  You get an automatic extension,

2    Mr. Grimm.

3          MR. GRIMM:  Where's my Court Reporter?

4          Did you get that?

5          So, Your Honor, a month to file.  And then --

6          THE COURT:  Give me a week at least to look at it

7    and I'll set a date for a hearing.

8          MR. GRIMM:  Very well.

9          MR. SALER:  After we file, Your Honor?

10         THE COURT:  After you file it.  I need to digest

11   it.

12         MR. SALER:  That's fine.

13         THE COURT:  So I'm not going to set a new --

14   I mean, it might be simple, it may be complicated,

15   I don't know how long it will take.  But to be safe, think I

16   need at least a week or so to review it and then figure out

17   what I want to do after that.

18         MR. GRIMM:  Yes, Your Honor.

19         Your Honor, could I file -- I'll meet with

20   Ms. Moses-Gregory.  I'll probably have attachments, exhibits

21   to what I file with the Court.  So the Court is saying Mr.

22   Grimm, you're saying $10, where's the receipt?

23         THE COURT:  Well, you know --

24         MR. GRIMM:  I know the Court's not --

25         THE COURT:  You don't have to do $10 cab fares in

```
 1    there, Mr. Grimm.  I'm looking for something a little more.

 2              MR. GRIMM:  Something with some meat on it.

 3              THE COURT:  Substantial, that's for sure.

 4              MR. GRIMM:  Your Honor, could we have till the

 5    20th to file whatever we're going to file with the Court?

 6              THE COURT:  That's fine.  Supplemental pleading,

 7    whatever you want to call it.

 8              MR. GRIMM:  Very well.

 9              MR. SALER:  Do you want this as a joint filing?

10              THE COURT:  No, no, because, you know, because --

11    no, doesn't have to be joint, no.  You can do it separate.

12              MR. GRIMM:  Well, I'll meet with Mr. Saler, to the

13    extent we can agree on numbers, and provide documents.

14              THE COURT:  If you want to, go ahead.

15              MR. GRIMM:  Very well.

16              THE COURT:  But, you know, I think Mr. Saler has a

17    different role than yours.  I think it behooves Mr. Saler to

18    have certain things nailed down, from his perspective.

19              MR. GRIMM:  Yes.  Hopefully, he heard the Court

20    that I have immunity for tomorrow.

21              THE COURT:  I didn't say that.

22              MR. GRIMM:  Thank you, Your Honor.

23              And I apologize, Your Honor, these numbers,

24    I should have had before the Court for today.

25              THE COURT:  All right, Mr. Grimm, no problem.
```

1          Stand in recess.

2          DEPUTY CLERK:  All rise.

3          This Honorable Court stands in recess until the

4   return of court.

5          (Proceedings concluded at 4:34 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.


Date: April 22, 2016_____     /S/__William P. Zaremba_____

                                 William P. Zaremba, RMR, CRR